MWC/USAO#20013R00374

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** JFM-14-0423 |
| | * | |
| **v.** | * | |
| | * | (Health Care Fraud, 18 U.S.C. § 1347; |
| **RAFAEL CHIKVASHVILI** | * | False Statements Relating to Health |
| | * | Care Matters, 18 U.S.C. § 1035(a)(1) |
| **Defendant.** | * | and (a)(2); Aggravated Identity Theft, |
| | * | 18 U.S.C. § 1028A; Aiding and Abetting, |
| | * | 18 U.S.C. § 2; Forfeiture, 18 U.S.C. |
| | * | § 982(a)(7) and 21 U.S.C. § 853) |
| | * | |

*******

## INDICTMENT

## COUNT ONE
### (Health Care Fraud)

At all times relevant to this Indictment:

### A.  The Defendant and 'Alpha Diagnostics Services, LLC'

1.   **RAFAEL CHIKVASHVILI,** was a resident of Baltimore, Maryland and holds a Doctor of Philosophy in mathematics.  **CHIKVASHVILI** formed Alpha Diagnostics Services, Inc., which later became Alpha Diagnostics, LLC, (hereinafter "Alpha Diagnostics") in 1993, and always acted as Managing Member, Authorized Official, Managing Employee, President and Chief Executive Officer for Alpha Diagnostics.

2.   **CHIKVASHVILI** was never a medical doctor or licensed physician.

3.   Alpha Diagnostics was headquartered in Owings Mills, Maryland with an office also located in Harrisburg, Pennsylvania.  **CHIKVASHVILI** worked full time at the Owings Mills office.

4.      Alpha Diagnostics was principally a mobile diagnostic medical service provider of X-rays in Maryland, Delaware, Pennsylvania, Virginia and the District of Columbia.   Alpha Diagnostics, however, also procured and transmitted mobile diagnostic ultrasound tests, electrocardiograms ("EKGs"), echocardiograms, Holter monitors and other medical tests.

B.      Medicare and Medicaid

5.      Medicare and Medicaid were health care benefit programs under 18 U.S.C. § 24(b); that is, a public or private plan or contract, affecting commerce, under which medical benefits, items and services were provided to individuals.   Typically, Medicare provided insurance coverage to people age 65 or older and people under age 65 with certain disabilities and Medicaid provided insurance coverage for persons of all ages whose income and resources were insufficient to pay for health care.

6.      The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services and was responsible for administering the Medicare and Medicaid programs.   CMS had the authority to make coverage and medical necessity determinations.

C.      **Medicare and Medicaid Requirements**

7.      CMS required that Alpha Diagnostics, as a mobile medical diagnostic service provider, make and preserve i) a record of the services performed; ii) a description of the type of examination; iii) the name of the referring physician; iv) the operator of the portable diagnostic equipment; and v) the name of the interpreting physician to whom the examination was sent.

8.      In order to pay for portable services, CMS required, among other obligations, that the X-ray or other medical test i) was ordered by a licensed physician; ii) met appropriate medical necessity; iii) was interpreted by a licensed physician who rendered a formal report; and iv) that

2

accurate and appropriate diagnoses and procedures, and corresponding codes, were enumerated on a Medicare/Medicaid payment claim form.

**D.     The Scheme and Artifice to Defraud**

9.     Beginning at least in 1997 and continuing through October 2013, **CHIKVASHVILI** did willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, that is, Medicare or Medicaid, and to obtain, by means of false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of Medicare and Medicaid, in connection with the delivery and payment for health care benefits, items and services; to wit, by creating false radiology, ultrasound and cardiologic interpretation reports; by submitting insurance claims for medical examination interpretations that were never completed by licensed physicians; by falsely representing to Medicare and Medicaid, as well as to treating physicians, that the interpretations had in fact been completed by actual licensed physicians; and by submitting insurance claims for radiology, ultrasound and cardiologic examinations (and their associated costs) that were never performed, and/or which were in excess of the number of examinations ordered by the treating physician, as set forth more fully below.

10.     It was part of the scheme and artifice to defraud that **CHIKVASHVILI** instructed his non-physician employees to perform X-ray interpretations in lieu of licensed radiologists.

11.     It was further part of the scheme to defraud that **CHIKVASHVILI** caused employees to draft a licensed "physician's" examination report in the name of a licensed physician. **CHIKVASHVILI**, in turn, caused a copy of the handwritten signature of the actual physician to be affixed to the report, of which a photocopy was made, creating the appearance that a licensed physician had performed the medical interpretation.

3

12.     It was further part of the scheme to defraud that **CHIKVASHVILI** instructed an employee to interpret medical tests and to draft reports in the names of licensed physicians while using the employee's personal computers and/or mobile telephone.

13.     It was further part of the scheme to defraud that **CHIKVASHVILI** instructed employees to interpret examinations and draft false reports for ultrasounds and cardiologic exams.

14.     It was further part of the scheme to defraud that if a patient caregiver contacted Alpha Diagnostics to question medical interpretations, **CHIKVASHVILI** reassigned the test/examination to a licensed physician for a second interpretation without informing the licensed physician of the prior interpretation.

15.     It was further part of the scheme to defraud that **CHIKVASHVILI** instructed a non-physician employee to represent that he was a physician while speaking with other persons on the phone.

16.     It was further part of the scheme to defraud that **CHIKVASHVILI** and Alpha Diagnostics routinely submitted insurance payment claims to Medicare and Medicaid exaggerating the number of anatomical views performed by its technologists and/or which were in excess of the number of views ordered by the treating physician.

17.     It was further part of the scheme to defraud that **CHIKVASHVILI** and Alpha Diagnostics routinely submitted insurance payment claims overcharging transportation costs.

18.     It was further part of the scheme to defraud that **CHIKVASHVILI** and Alpha Diagnostics routinely billed Medicare and Medicaid for "global" X-ray procedures (i.e., both professional and technical components), along with transportation and setup charges, for studies interpreted "in-house" by non-physician employees.

19.     It was further part of the scheme to defraud that **CHIKVASHVILI** falsely

represented to CMS, private insurers and/or state regulators that Alpha Diagnostics was properly overseen by supervising physicians.

## The Charge

20.     Beginning at least in 1997 and continuing through in or about October 2013, in the District of Maryland and elsewhere, the defendant,

### RAFAEL CHIKVASHVILI,

did knowingly and willfully execute and attempt to execute the scheme and artifice to defraud Medicare and Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare and Medicaid, health care benefit programs under 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items and services; to wit, by creating false radiology, ultrasound and cardiologic reports; by submitting insurance claims for medical examination interpretations that were never completed by licensed physicians; by falsely representing to Medicare and Medicaid, as well as to ordering physicians, that the interpretations had in fact been completed by actual licensed physicians; and by submitting insurance claims for radiology and ultrasound examinations (and their associated costs) that were never completed, and which were in excess of the number of examinations ordered by the treating physician.

18 U.S.C. § 1347
18 U.S.C. § 2

## COUNTS TWO THROUGH TEN
### (False Statement)

The Grand Jury for the District of Maryland further charges that:

1.       The allegations contained in Paragraphs 1 through 19 of Count 1 of this Indictment are incorporated here.

2.       When a licensed physician is interpreting an X-ray, ultrasound or cardiologic examination, the physician must accurately document his medical findings in an examination report for both treatment of the patient and subsequent reimbursement from CMS.   The physician must include his name and title.   In multiple examination reports, **CHIKVASHVILI** facilitated the entry of medical findings and falsely included the names and titles of physicians who had not, in fact, interpreted the examination nor provided the medical findings to create the reports.

3.       On or about the below dates, in the District of Maryland, the defendant,

### RAFAEL CHIKVASHVILI,

in a matter involving a health care benefit program, did knowingly and willfully falsify, conceal and cover up by any trick, scheme and device a material fact, and make a materially false, fictitious and fraudulent statement and representation, and make and use any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, defendant **CHIKVASHVILI** made and caused to be made false entries in the examination reports of multiple patients which stated that licensed physicians had interpreted the underlying X-rays or ultrasounds of the patients, to wit:

6

| Count | Patient | Date of Service | Listed Physician |
|-------|---------|-----------------|------------------|
| 2 | AT | 2/23/2010 | RW |
| 3 | SW | 5/25/2011 | SH |
| 4 | RB | 1/16/2012 | RW |
| 5 | CG | 1/23/2012 | SH |
| 6 | MK | 4/17/2012 | VI |
| 7 | HA | 6/12/2012 | RW |
| 8 | NT | 6/13/2012 | RW |
| 9 | WL | 6/13/2012 | RW |
| 10 | MW | 10/20/2012 | MK |

18 U.S.C. § 1035(a)(1) and (a)(2)
18 U.S.C. § 2

## COUNT ELEVEN
### (Aggravated Identity Theft)

The Grand Jury for the District of Maryland further charges that:

1.      The allegations contained in Paragraphs 1 through 19 of Count 1 and Paragraph 2 of Counts Two, Four, Seven, Eight and Nine of this Indictment are incorporated here.

2.      From on or about February 23, 2010 through on or about June 13, 2012, in the District of Maryland and elsewhere, the defendant,

### RAFAEL CHIKVASHVILI,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit, **CHIKVASHVILI** included the name of Physician RW in examination reports during and in relation to a violation of Title 18, United States Code § 1347 as charged in Count One of this Indictment and a violation of Title 18, United States Code § 1035 as charged in Counts Two, Four, Seven, Eight and Nine of this Indictment.

18 U.S.C. §§ 1028A(a)(1), (c)(4) and (c)(5)
18 U.S.C. § 2

## COUNT TWELVE
### (Aggravated Identity Theft)

The Grand Jury for the District of Maryland further charges that:

1.      The allegations contained in Paragraphs 1 through 19 of Count 1 and Paragraph 2 of Count Five of this Indictment are incorporated here.

2.      On or about January 23, 2012, in the District of Maryland and elsewhere, the defendant,

**RAFAEL CHIKVASHVILI,**

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit, **CHIKVASHVILI** included the National Provider Identifier number and name of Physician SH in a Medicare reimbursement claim during and in relation to a violation of Title 18, United States Code § 1347 as charged in Count One of this Indictment and a violation of Title 18, United States Code § 1035 as charged in Count Five of this Indictment.

18 U.S.C. §§ 1028A(a)(1), (c)(4) and (c)(5)
18 U.S.C. § 2

## FORFEITURE ALLEGATIONS

The Grand Jury for the District of Maryland further charges that:

1.      As a result of the offenses alleged in Counts One through Twelve of this Indictment, the defendant,

### RAFAEL CHIKVASHVILI,

shall forfeit to the United States any and all property, real and personal, constituting or derived, directly or indirectly, from gross proceeds traceable to the offenses, including, but not limited to:

a.      At least approximately $7.5 million;

b.      **ALPHA DIAGNOSTICS LLC:**

   1) All funds ($767,249.74) formerly held in PNC Bank, account number 53-1010-1213.

   **ALPHA DIAGNOSTIC SERVICES:**

   2) All funds ($291,568.44) formerly held in PNC Bank, account number 55-0136-7276.

   **ALPHA CAPITAL LLC:**

   3) All funds ($34,065.58) formerly held in PNC Bank, account number 53-1010-1467.

2.      If, as a result of any act or omission of **RAFAEL CHIKVASHVILI**, any such property subject to forfeiture:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred or sold to, or deposited with, a third person;

   c.      has been placed beyond the jurisdiction of the Court;

   d.      has been substantially diminished in value; or

   e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, § 853(p), to seek

forfeiture of any other property of said defendant up to the value of the above forfeitable

property, including but not limited to the following assets:

a.      The real property common known as:

9601 Collins Ave
Majestic Tower at Bal Harbour
Condominium Unit: 402
Bal Harbour, FL 33154; and

3100 Stone Cliff Drive
Condominium Unit: 407
Baltimore, MD 21209.

b.      The vehicles identified as:

2007 Mercedes-Benz S550 4MATIC, VIN: WDDNG86X07A109346;

2010 BMW 535XI, VIN: WBANV9C52AC139482; and

2011 BMW X5 XDRIVE35I, VIN: 5UXZV4C51BL410992.

c.      The accounts identified as:

Wells Fargo Bank account number 1034609258493;

Susquehanna Bank account number 10012816640;

Susquehanna Bank account number 10012816996;

Charles Schwab account number 7162-4974;

Charles Schwab account number 1177-3540;

PNC Bank account number 5501278601;

T.Rowe Price account number 52880797-6 (Investor Number 8309630);

Charles Schwab account number 6230-9535;

Charles Schwab account number 5295-1632;

Charles Schwab account number 5190-6106;

Wells Fargo Bank account number 1010070160053;

Wells Fargo Bank account number 9973406896;

Wells Fargo Bank account number 1010308118201;

Susquehanna Bank account number 3115004902;

Susquehanna Bank account number 10013124945;

SunTrust Bank account number 1000168516614; and

SunTrust Bank account number 1000168518545.

d.    The property identified as:

currency and assets located in safe deposit box no. 68300155 held at Susquehanna Bank.

18 U.S.C. §§ 982(a)(7), 982(b)(1)
21 U.S.C. § 853

Rod J. Rosenstein    *by MWC*
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Dated:   September 11, 2014